## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THOMAS NICHOLAS SALTOS,** | : | **Civil No.  3:24-CV-006** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **MARTIN O'MALLEY**, | : | |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

## I.      Introduction

This Social Security appeal illustrates a cardinal principle in the art of advocacy: astute issue selection. Through the careful identification of legal issues, counsel can greatly advance the cause of their clients. Conversely, unwise issue selection may, on occasion, snatch defeat from the jaws of success.

That is almost what happened here. On appeal, the focus of Saltos' argument was his contention that the Administrative Law Judge (ALJ) erred at Step 3 of the sequential analysis which governs disability claims. Given the very exacting nature of the plaintiff's burden at Step 3 to show disability *per se*, this argument fails. However, embedded within this sweeping but unpersuasive claim was a narrower argument with much greater persuasive power. Specifically, Saltos contends that the

ALJ completely failed to analyze, address, or acknowledge two treating source medical opinions, both of which supported Saltos' disability claim.

On this narrow ground, which we find was barely preserved for appeal, plaintiff in this case, Saltos, is correct. Therefore, we will remand this case for further consideration of this particular issue.

## II.   <u>Statement of Facts and of the Case</u>

With respect to this medical opinion issue, the administrative record of Saltos' disability application reveals the following essential facts: On August 28, 2020, Saltos, who was born in 1984, filed an application for child's insurance benefits, alleging disability beginning September 1, 1995. (Tr. 14). In this application for disability benefits, Saltos alleged that he was disabled due to an array of emotional impairments, including depression, anxiety with social phobia, obsessive compulsive disorder, and body dysmorphic disorder. (Tr. 16).

With respect to this constellation of emotional impairments, the administrative record reveals at least five medical opinions, however, only three of these opinions are acknowledged by the ALJ in his decision.

First, on October 28, 2020, a state agency expert, Dr. John Gavazzi, opined that Saltos suffered from no medically determinable impairments. (Tr. 67-69). Five months later, on March 12, 2021, a second state agency expert, Dr. Frederic Small

2

issued a reconsideration decision which reached slightly different conclusions, Specifically, Dr. Small found that Saltos' emotional impairments were medically determinable but concluded that their severity could not be readily identified. (Tr. 71-79). In the decision denying this application for benefits, the ALJ characterized both of these opinions as unpersuasive. (Tr. 22).

In addition, the ALJ acknowledged some medical opinions provided by a former treating source, Dr. Uma Devi. (Tr. 21). Dr. Devi had opined in 2002 that Saltos' emotional impairments limited his ability to work before large groups and adjust to sudden stresses or changes in his work environment. (Tr. 308). Later in 2021, Dr. Devi explained that Saltos was disabled due to chronic mental health issues, and as an "ideal" candidate for disability benefits. (Tr, 756-57). In the decision denying Saltos' application for benefits, the ALJ described Dr. Devi's opinions as "partially persuasive." (Tr. 20).

The record, however, reveals two other medical opinions from treatment sources, both of whom found that Saltos was totally disabled due to his emotional impairments. On August 10, 2022, Dr. Johar Shah and Dr. Angelo Fordimondo, both of whom were treating Saltos, completed disability assessment forms which described Saltos as totally disabled due to the anxiety he experienced as a result of his body dysmorphia. (Tr. 766-777). Neither of these treating source opinions was

3

analyzed, addressed, or even acknowledged by the ALJ in the decision denying Saltos' application for benefits.

Fourteen days after these two treating sources opined that Saltos was disabled, on August 24, 2022, a disability hearing was conducted by an ALJ in this case, at which Saltos, his mother, and a vocational expert testified. (Tr. 29-65). Following the hearing, on October 4, 2022, the ALJ issued a decision denying Saltos' application for benefits. (Tr. 11-24).[1] In that decision, the ALJ first concluded that Saltos had not attained the age of 22 at the time of the alleged onset of his disability in 1995 and had not engaged in substantial gainful activity since that time. (Tr. 16). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Saltos had the following severe impairments: depression, anxiety with social phobia, obsessive compulsive disorder, and body dysmorphic disorder. (Id.)

The ALJ then concluded at Step 3 of this sequential analysis that none of Saltos' impairments were *per se* disabling, and provided the following analysis in support of this conclusion:

> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, the undersigned has

---

[1] We note that the ALJ's decision seems, at times, to conflate adult and juvenile disability standards, but need not address this issue, which has not been highlighted by the parties, in light of our disposition of this case on other grounds.

considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering or applying information, the claimant has no limitation. The claimant asserts that his conditions limited his ability to follow instructions, focus, concentrate, complete tasks, and manage his finances (Exhibit 6E). He also asserts that he needed special reminders to care for his personal needs and grooming, to take medications, and to go places (Exhibit 6E). However, the claimant failed to submit any evidence of mental status examinations that noted any significant limitation in his orientation, thought processing, judgment, or insight. Despite the fact that treatment records note the claimant had an Individualized Education Program (IEP) plan that allowed repetition of instructions, they do not note any significant and ongoing issues in the claimant's ability to function in this area. Instead, the record notes that the claimant generally performed well in his academic course load with accommodations in place to address his concentration, social concerns, and anxiety (Exhibit 1F; 2F; 7F). Similarly, the claimant's activities of daily living indicate the claimant is able to care for his personal needs and grooming, including his ability to dress, bathe, care for his hair, shave, feed himself, and use the bathroom (Exhibit 6E). He is also able to prepare meals on a regular basis and perform house and yard work, including mowing the lawn, vacuuming, and performing other chores (Exhibit 6E; Hearing Testimony). The claimant is able to go outside alone and shop in stores (Exhibit 6E). Given the overall evidence of record, the undersigned finds the claimant has no limitation in this functional area.

In interacting with others, the claimant has a moderate limitation. The claimant asserts that his conditions caused anxiousness around people or crowds, panic attacks, and dizziness and anxiety during oral presentations (Hearing Testimony). He also asserts that he could not

handle stress or changes in routine (Exhibit 6E). Moreover, the overall evidence of record establishes the claimant has a history of mental health conditions that impacted his ability to interact with others during the relevant period (Exhibit 6E). The record also notes the claimant had an IEP plan in place that limited his social interactions in his academics and dormitory housing (Exhibit 1F; 2F; 7F). However, the record notes that the claimant was able to attend regular educational courses that was sufficient to obtain his bachelor's and master's degree (Exhibit 1F; 2F; 7F). In addition, the claimant is able to regularly spend time with others via in person and electronic means (Exhibit 6E). He has never been fired or laid off from a job because of problems getting along with other people (Exhibit 6E). He is also able to go outside alone and shop in stores (Exhibit 6E; Hearing Testimony). Given the overall evidence of record, the undersigned finds the claimant has a moderate limitation in this functional area.

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The claimant asserts that his conditions limited his ability to follow instructions, focus, concentrate, and complete tasks (Exhibit 6E). He also asserts that he needed special reminders to care for his personal needs and grooming, to take medications, and to go places (Exhibit 6E). In addition, he asserts that he could not handle stress or changes in routine (Exhibit 6E). Notably, the claimant failed to submit any evidence of mental status examinations that noted any significant limitations in this functional area. However, treatment records note the claimant was under an IEP plan to address his concentration, social concerns, and anxiety (Exhibit 1F; 2F; 7F). The record also notes the claimant had a history of obsessive compulsive disorder that presented as body dysmorphic disorder and limited his ability to concentrate (Hearing Testimony; Exhibit 1F; 2F; 7F). Similarly, the claimant's activities of daily living indicate the claimant is able to care for his personal needs and grooming, including his ability to dress, bathe, care for his hair, shave, feed himself, and use the bathroom (Exhibit 6E). He is also able to prepare meals on a regular basis and perform house and yard work, including mowing the lawn, vacuuming, and performing other chores (Exhibit 6E; Hearing Testimony). The claimant is able to go outside

6

alone and shop in stores (Exhibit 6E). Given the overall evidence of record, the undersigned finds the claimant has a moderate limitation in this functional area.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The record notes the claimant has a history of mental health conditions that caused subjective reports of symptoms that limited his ability to function during the relevant period (Exhibit 1F; 2F; 7F; Hearing Testimony). The record also notes the claimant had an IEP in place to address his concentration, social concerns, and anxiety to allow him to sufficiently progress in learning (Exhibit 1F; 2F; 7F). In addition, the claimant required family supports to help manage his conditions (Exhibit 1F; 2F; 7F; Hearing Testimony). However, the claimant failed to submit any additional evidence of mental status examinations to show the impact of his conditions in this area of functioning. Similarly, the claimant's activities of daily living indicate the claimant is able to care for his personal needs and grooming, including his ability to dress, bathe, care for his hair, shave, feed himself, and use the bathroom (Exhibit 6E). He is also able to prepare meals on a regular basis and perform house and yard work, including mowing the lawn, vacuuming, and performing other chores (Exhibit 6E; Hearing Testimony). The claimant is able to go outside alone and shop in stores (Exhibit 6E). Given the overall evidence of record, the undersigned finds the claimant has a moderate limitation in this functional area.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria as the record does not establish that the claimant has marginal adjustment, meaning minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(Tr. 16-18).

Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity

("RFC") for the plaintiff which found that:

After careful consideration of the entire record, the undersigned finds that, prior to attaining age 22, the claimant had the residual functional capacity to perform a full range of work at all exertional levels. The claimant retains the mental capacity to concentrate, persist, or maintain pace for two hour segments sufficient to perform two to three step tasks or instructions in an environment that does not involve fast-paced production quotas. The claimant can frequently interact with public, supervisors, or coworkers in an environment that does not require working in a large group or making presentations to large audiences. The claimant can perform work that involves no more than occasional changes in work situations in a routine work setting.

(Tr. 18-19).

In making the RFC determination, the ALJ considered the medical opinions

of the state agency experts, which he found to be unpersuasive, and Dr. Devi's

treating source opinion, which he deemed partially persuasive, but never mentioned

the most recent treating source statements from Dr. Shah and Dr. Fordimondo. (Tr.

8

20-22). Having arrived at this RFC assessment, the ALJ found that Saltos could perform work in the national economy, did not meet the stringent standard for disability set by the Act, and denied this claim. (Tr. 22-23).

This appeal followed. (Doc. 1). On appeal, the primary thrust of Saltos' argument is that the ALJ erred at Step 3 of this analysis when he found that Saltos was not disabled *per se*. (Doc. 15). We find this main argument unavailing. However, on appeal Saltos also advances the following additional contention:

> In Mr. Saltos' case, his treating psychiatrist, Dr. Shah, completed a residual functional capacity assessment that stated "Mr. Salto's anxiety and body dysmorphic disorder seem to preclude employment at this time." (R. 776). The ALJ's decision did not even consider this treating source opinion. In addition, the ALJ failed to consider the Residual Functional Capacity form completed by Angelo J. Fordimondo, PhD, a psychologist who opined that given his experience with Mr. Saltos as a patient, and his diagnosis and the patient's disability, he does not believe Mr. Saltos should continue or resume work at any current or previous employment. (R. 772). He also opined that the disability is not likely to change. (R.772). This constitute [sic] reversible error warranting remand.

(Id. at 8).

This latter argument, while presented in a curiously cursory fashion, is both sufficiently developed to warrant consideration and is undeniably meritorious since the ALJ never even acknowledged the existence of these medical opinions.

9

Therefore, on this ground we will direct that this case be remanded for further consideration by the Commissioner.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>,

383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

<u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our

review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——,
> 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>,
> 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial
> evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see,
> e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks
> omitted). It means—and means only—"such relevant evidence as a
> reasonable mind might accept as adequate to support a conclusion."
> <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v.
> Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)
> (comparing the substantial-evidence standard to the deferential clearly-
> erroneous standard).

<u>Biestek</u>, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is

disabled, but rather whether the Commissioner's finding that he is not disabled is

supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his

decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000).

As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B.   <u>Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence.</u>

The plaintiff filed this disability application in 2020 after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of

2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." <u>Revisions to Rules Regarding the Evaluation of Medical Evidence</u> ("<u>Revisions to Rules</u>"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), <u>see</u> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." <u>Id</u>. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. <u>Revisions to Rules</u>, 82 Fed. Reg. 5844-01 at 5853.
>
> An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20

14

C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ

15

may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016).

Finally, one other cardinal principle governs this medical opinion analysis. An ALJ may not simply ignore and fail to address material medical opinion evidence. As the Third Circuit has noted:

> This Court has long been concerned with ALJ opinions that fail properly to consider, discuss and weigh relevant medical evidence. See Dobrowolsky v. Califano, 606 F.2d 403, 406–07 (3d Cir.1979) ("This Court has repeatedly emphasized that the special nature of proceedings for disability benefits dictates care on the part of the agency in

16

developing an administrative record and in explicitly weighing all evidence."). Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided. <u>See Cotter</u>, 642 F.2d at 706 (listing cases remanded for ALJ's failure to provide explanation of reason for rejecting or not addressing relevant probative evidence).

<u>Fargnoli v. Massanari</u>, 247 F.3d 34, 42 (3d Cir. 2001). Therefore, a complete failure to analyze, address, or acknowledge relevant medical opinions compels a remand.

**D.    <u>This Case Will Be Remanded to Consider the Medical Opinion Evidence</u>**

As we noted at the outset, this case is marked by some curious issue selections by the plaintiff, who devotes great energy on appeal to attacking the ALJ's Step 3 determinations. In our view these arguments are unavailing when considered under the governing legal standards which define Step 3 analysis.

The dichotomy between the Act's deferential standard of review and caselaw's requirement that ALJs sufficiently articulate their findings to permit meaningful judicial review is particularly acute at Step 3 of this disability evaluation process. At Step 3 of this sequential analysis, the ALJ is required to determine whether, singly or in combination, a claimant's ailments and impairments are so severe that they are *per se* disabling and entitle the claimant to benefits. As part of this step three disability evaluation process, the ALJ must determine whether a

claimant's alleged impairment is equivalent to a number of listed impairments, commonly referred to as listings, that are acknowledged as so severe as to preclude substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(iii); 20 C.F.R. pt. 404, subpt. P, App. 1; Burnett, 220 F.3d 112, 119.

In making this determination, the ALJ is guided by several basic principles set forth by the social security regulations and case law. First, if a claimant's impairment meets or equals one of the listed impairments, the claimant is considered disabled *per se* and is awarded benefits. 20 C.F.R. § 416.920(d); Burnett, 220 F.3d at 119. However, to qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to a listed impairment, a plaintiff bears the burden of presenting "medical findings equivalent in severity to *all* the criteria for the one most similar impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990); 20 C.F.R. § 416.920(d). An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient. Id.

The determination of whether a claimant meets or equals a listing is a medical one. To be found disabled under step three, a claimant must present medical evidence or a medical opinion that his or her impairment meets or equals a listing. An administrative law judge is not required to accept a physician's opinion when that opinion is not supported by the objective medical evidence in the record. Maddox v.

Heckler, 619 F. Supp. 930, 935-936 (D.C. Okl. 1984); Carolyn A. Kubitschek & Jon

C. Dubin, Social Security Disability Law and Procedure in Federal Courts, § 3:22

(2014), *available at* Westlaw SSFEDCT. However, it is the responsibility of the ALJ

to identify the relevant listed impairments, because it is "the ALJ's duty to investigate

the facts and develop the arguments both for and against granting benefits." Burnett,

220 F.3d at 120 n.2.

On this score, however, it is also clearly established that the ALJ's treatment

of this issue must go beyond a summary conclusion, since a bare conclusion "is

beyond meaningful judicial review." Burnett, 220 F.3d at 119. Thus, case law "does

not require the ALJ to use particular language or adhere to a particular format in

conducting his analysis. Rather, the function . . . is to ensure that there is sufficient

development of the record and explanation of findings to permit meaningful

review." Jones, 364 F.3d at 505. This goal is met when the ALJ's decision, "read as

a whole," id., permits a meaningful review of the SLJ's Step 3 analysis. However,

when "the ALJ's conclusory statement [at Step 3] is . . . beyond meaningful judicial

review," a remand is required to adequately articulate the reasons for rejecting the

claim at this potentially outcome-determinative stage. Burnett, 220 F.3d at 119.

In this case, as we have discussed, the ALJ's Step 3 analysis was thorough, careful, and detailed. It addressed the pertinent listing criteria and was supported by substantial evidence. There was no error in this regard.

However, as we have also noted, in this case Saltos has advanced another, far more persuasive argument, albeit in a somewhat cursory fashion. On appeal, Saltos also contends that:

> In Mr. Saltos' case, his treating psychiatrist, Dr. Shah, completed a residual functional capacity assessment that stated "Mr. Salto's anxiety and body dysmorphic disorder seem to preclude employment at this time." (R. 776). The ALJ's decision did not even consider this treating source opinion. In addition, the ALJ failed to consider the Residual Functional Capacity form completed by Angelo J. Fordimondo, PhD, a psychologist who opined that given his experience with Mr. Saltos as a patient, and his diagnosis and the patient's disability, he does not believe Mr. Saltos should continue or resume work at any current or previous employment. (R. 772). He also opined that the disability is not likely to change. (R.772). This constitute [sic] reversible error warranting remand.

(Doc. 15, at 8).

This contention is well taken. The ALJ's decision does not analyze, address, or acknowledge these medical opinions which were issued a mere fourteen days before the hearing in Saltos case. This is a material oversight since both doctors opined that Saltos was totally disabled. Given the plain materiality of this evidence, we find that this case is governed by the familiar proposition that:

20

> Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided. See Cotter, 642 F.2d at 706 (listing cases remanded for ALJ's failure to provide explanation of reason for rejecting or not addressing relevant probative evidence).

Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001).

Therefore, finding that this issue was adequately raised and preserved by Saltos,[2] and that the complete failure to address these medical opinions compels a remand, this case will be remanded for further consideration by the Commissioner.

Thus, we conclude that the ALJ's failure to address these two treating source opinions, both of which found Saltos to be disabled, now requires a remand of this case for a more fulsome assessment of the medical opinion evidence. Accordingly, we will remand this case to the Commissioner for further consideration of this evidence. Yet, while we reach this result, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

---

[2] We note and acknowledge the Commissioner's argument that this medical opinion issue was not sufficiently preserved on appeal. While we regard this as a close case, we conclude that the plaintiff's argument cited above sufficiently articulated this issue to warrant merits consideration of this plainly meritorious claim.

IV.   **<u>Conclusion</u>**

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be REMANDED for further consideration by the Commissioner.

An appropriate order follows.

<u>*s/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: August 13, 2024